UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARANJIT MALHI, as Personal Representative,
for the ESTATE OF KANWARBIR SINGH
MALHI, deceased,

     Plaintiff,                           Case No. 21-11424

v                                        Hon.

THE CHARTER OF SHELBY TOWNSHIP,
Police Officer JASON ZUK in his individual
capacity, and Police Officer JOSEPH
WOJCIK in his individual capacity,

     Defendants.
_____

AKEEL & VALENTINE, PLC
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Adam S. Akeel (P81328)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 420
Troy, MI   48084-4736
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
adam@akeelvalentine.com

---

## COMPLAINT AND JURY DEMAND

---

**NOW COMES** Plaintiff, KARANJIT MALHI, as Personal Representative,

for the ESTATE OF KANWARBIR SINGH MALHI, deceased, by and through his

undersigned counsel, Akeel & Valentine, PLC, and for his complaint against Defendants, THE CHARTER OF SHELBY TOWNSHIP, JASON ZUK, and JOSEPH WOJCIK, states as follows:

## PRELIMINARY STATEMENT

1.     This civil rights and wrongful death action involves the shocking, tragic shooting of a mentally-ill young man without any valid excuse or legal justification. This case demonstrates a clear use of excessive force, and the lack of regard and/or training of officers in dealing with a mentally challenged citizen.  On November 2, 2018, then-25-year-old, Kanwarbir Singh Malhi's mother, Gurraj, called police to report that her son has mental health issues and was missing.  She also reported that he had taken her vehicle without her permission.  She made it clear that she was calling about the well-being of her mentally ill child, not about the return of the car. Around 1 a.m. on November 3, 2018, Kanwarbir had *returned home* and parked his mother's vehicle right by her home.  Then, an officer – who was patrolling the area and had taken the initial report where he learned from the mother of her child's mental challenges – spotted the car, abruptly exited his vehicle with his weapon drawn on Kawnarbir, and ordered Kanwarbir to stay in the car.  The officer further escalated the situation by retrieving his police dog which was barking ferociously, called for backup who also arrived with their guns drawn, knowing all along that the car has now been returned safely with the mentally ill son inside it.  Still, officers on

the scene secured the perimeter and decided to wait for their sergeant before taking

further action.  Meanwhile, they also began to search for, and retrieve, non-lethal

weapons.  Afterwards, officers ordered Kanwarbir out of the car – which he first

tried to do but was ordered to stay in the car – and he agreed, if officers put the police

dog away.  At around 1:08 a.m., a final officer arrived on the scene.  Seconds later,

that last officer on the scene asked which vehicle Kanwarbir was in and shot

Kanwarbir in the chest and neck as he was getting out of the car as ordered, killing

him within a second of getting out of the car, and with his family within earshot.

With the sound of a gunshot still ringing in their ears, a family cries out, "[m]y

brother, my brother!"

## JURISDICTIONAL ALLEGATIONS

2.      This action arises under 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

3.      Jurisdiction is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

4.      This Court has supplemental jurisdiction over Plaintiff's state law

claims under 28 U.S.C. § 1367.

5.      The acts complained of occurred in the Eastern District of Michigan,

and venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

6.      Plaintiff seeks damages for the Estate, including any and all damages

and attorney fees recoverable pursuant to the Wrongful Death Statute, MCL

600.2922, and 42 U.S.C. Sections 1983 and 1988, including costs, and any further relief the Court deems proper.

## **PARTIES**

7.      Kanwarbir Singh Malhi is Sikh and of Indian origin and was a resident of Shelby Township, in the State of Michigan.

8.      Upon information and belief, Defendants, Officer Jason Zuk and Officer Joseph Wojcik, are residents of the State of Michigan, and at all relevant times were employed by the Shelby Township Police Department ("STPD").

9.      At all relevant times, Defendant Shelby Township is a charter township regulated by the Charter Township Act adopted by the Michigan State Legislature.

10.      Upon information and belief, at all relevant times, Defendant Shelby Township oversees and supervises the Shelby Township Police Department.

11.      When the events alleged in this Complaint occurred, Defendants Zuk and Wojcik were acting within the course and scope of their employment and under color of law.

12.      At all times relevant to this Complaint, these Defendants acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of Michigan, Shelby Township, and the Shelby Township Police Department.

13.      Plaintiff also sues Defendants Zuk and Wojcik in their individual capacities.

## FACTUAL ALLEGATIONS

14.     Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

***Kanwarbir struggles with mental illness.***

15.     In November 2018, Kanwarbir lived at home with his father, Rachhpal Malhi; his mother, Gurraj Kaur Malhi; and sister, Krisham Malhi, who was a minor at the time.

16.     At that time, Kanwarbir was a 25-year-old male who suffered from mental health issues.

17.     Kanwarbir began showing signs of mental illness around the age of 15 years old and these symptoms became more severe as he grew older.

18.     Kanwarbir was diagnosed with bi-polar disorder six months to a year before the incident that ended his life.

19.     Kanwarbir had also recently begun taking Suboxone to wean himself off opioids.

***Gurraj's first call to Shelby Township Police Department which is then alerted to Kanwarbir's mental illness.***

20.     On November 1, 2018, Shelby Township Police Department ("STPD") officers were dispatched to Kanwarbir's home "on a mental health call."

21.     The Dispatch Report for this call notes that "*Caller thinks her mentally challenge [sic] son ran away.*"

5

22.     Defendants' police report on the call, CR No. 180030935, notes that "*Shelby dispatch advised the caller [Gurraj] originally called about her son (Kanwarbir Malhi) being possibly missing, but later found him in at the residence in an agitated state.*"

23.     Gurraj, who had been at work, could not get a hold of her son, leading her to believe that he had gone missing.

24.     STPD Officers Boehm, Nicely, and Sergeant Bunch answered the call.

25.     Just before STPD officers arrived at the residence, Gurraj had arrived home and found Kanwarbir in his room.

26.     Defendants' police report notes that even though Gurraj had located her son, she "*asked that STPD officers check on him to see how he was doing.*"

27.     When the STPD officers arrived at the residence, Gurraj told them that she had received a text message from her nephew telling her that Kanwarbir had sent him a message about "going far away" which scared her.

28.     Gurraj explained to the officers that in her culture, this meant that he wanted to harm himself.

29.     Gurraj explained that her son, Kanwarbir, was "mentally upset" and "*was explaining that her son has had a history of mental health issues.*"

30.     Gurraj also cited previous trips to the hospital for these issues.

31.     Officers then asked Gurraj if he might have any weapons.

32.     Gurraj denied that they have any weapons in the home.

33.     Gurraj also confirmed with the officers that Kanwarbir lives in the apartment with her.

34.     Gurraj allowed the officers into the apartment and led them to Kanwarbir's bedroom.

35.     Kanwarbir was in his bed when officers came to his door, and Kanwarbir asked them to leave.

36.     Kanwarbir repeatedly requested privacy, for officers to leave him alone, and that he was fine.

37.     Officers asked Kanwarbir to show them his hands.

38.     Kanwarbir eventually lifted his hands from beneath the sheets and stated that he was going to take a video of the interaction.

39.     Defendants' police report also noted that "*Kanwarbir stated to all officers on scene that he did not wish to hurt himself or anyone else.*"

40.     STPD officers then determined that no protective custody was needed and advised Gurraj, Kanwarbir's mother, on the probate process to obtain a court order for mental evaluation.

**Gurraj's second call to STPD, and Kanwarbir's mental condition is again reported to STPD officers.**

7

41.     A day later, on November 2, 2018, at around 4:57 p.m., Gurraj reported that her son, Kanwarbir, had gone missing and appeared to have taken her 2005 Honda vehicle without her permission from their apartment.

42.     Recognizing that this was a domestic family dispute call, the Dispatch Report for this call notes, "*Caller stated her son took her gray Honda [Civic] last night without permission.*"

43.     Official reports from the STPD describe the matter as the Unauthorized Driving Away of an Automobile ("UDAA"), codified as MCL § 750.414, which is a misdemeanor offense.

44.     Defendants' police report, CR No. 180031051, also notes that the verified offense was a "*2475 Motor Vehicle as Stolen Property – Unauthorized Use (inc Joy Riding)*" – which is a misdemeanor.

45.     Defendant, STPD Officer Joseph Wojcik, responded to the call and interviewed Kanwarbir's mother, Gurraj, at their apartment.

46.     STPD Officers Hansen and Gammichhia were also on scene as backup.

47.     Gurraj told Defendant Wojcik that, in addition to her son being missing, the keys to her 2005 Honda Civic were missing and that she suspected her son, Kanwarbir, took them.

48.     Gurraj stated that she did not know where Kanwarbir was but told STPD officers, including Defendant Wojcik, that Kanwarbir talked about a rehab center and a mental hospital.

49.     Gurraj stated that the vehicle was last seen on November 1, 2018 around 7 p.m.

50.     Defendant Wojcik then confirmed specifically that Gurraj wanted the vehicle located and Kanwarbir's welfare checked, only.

51.     Defendant Wojcik then left a business card with Gurraj and advised her to call if Kanwarbir returned with the vehicle.

52.     Defendant Wojcik then entered the vehicle, a 2005 Grey Honda Civic, License Plate # CJQ692, into LEIN as stolen and sent out a "Be on the Lookout" notice with vehicle and suspect information.

***Kanwarbir returns home with the vehicle and is killed by STPD officers.***

53.     Hours later, just after midnight, on November 3, 2018, at around 1 a.m., Defendant Wojcik recognized a vehicle entering the apartment complex, Spring Hill Apartments, where Kanwarbir lived with his parents and sister, and where Defendant Wojcik himself had taken the UDAA report by Kanwarbir's mother just a few hours earlier, knowing, as well, that Kanwarbir was mentally ill.

54.     Defendant Wojcik radioed dispatch with the vehicle's license plate.

55.    Dispatch – STPD Officer Beth Walsh – returned the radio call confirming the plate, "returns on a 2005 Honda Civic coming back stolen out of our department think that was the call that dayshift entered earlier."  Defendant Wojcik himself investigated that "call that dayshift entered earlier."

56.    At no point did dispatch or Defendant Wojcik clarify that this was a missing person or domestic issue where a mother reported her child, Kanwarbir, had gone missing, had mental health issues, is who she believed took her car without her permission, and is concerned about his well-being.

57.    Defendant Wojcik was aware, by virtue of his being at Kanwarbir's residence a few hours earlier and speaking with Gurraj, that the vehicle was now returned safely and Kanwarbir had returned to his mother's home.

58.    Defendant Wojcik was also aware of Kanwarbir's mental health challenges, as described by his mother.

59.    Despite this, as Kanwarbir parked his mother's Honda Civic in a parking space directly in front of their apartment where they both live, Officer Wojcik turned on his police lights and parked his police cruiser a little behind and to the side of the vehicle Kanwarbir just parked.

60.    Immediately, and with no one in danger or imminent harm, Defendant Wojcik took out his gun and held Kanwarbir at gun point just outside Kanwarbir's,

and his mother's, apartment despite him assuring the mother that he would locate the vehicle and check on Kanwarbir's welfare, only.

61.    Defendant Wojcik then ordered Kanwarbir to shut his vehicle off.

62.    Kanwarbir complied.

63.    At gun point, Defendant Wojcik also ordered Kanwarbir to put his hands outside the driver's side window.

64.    Kanwarbir again complied.

65.    All the while, Defendant Wojcik's police dog was ferociously barking from inside the police cruiser.

66.    Defendant Wojcik also never puts his firearm away, and there was no one in danger or in imminent harm.

67.    After a few moments, Kanwarbir pulled his hands back into the car.

68.    At one point, Kanwarbir opened the driver's side door to exit the vehicle but was met with yells by Defendant Wojcik to get back in the vehicle.

69.    Three minutes later – while still having the son who was sitting in the car at gun point – at around 1:03 a.m., Officer Messing arrived on the scene.

70.    Officer Messing immediately exited his vehicle with his department issued firearm drawn and joined Defendant Wojcik.

71.     Again, Defendant Wojcik knew that the car was safely returned home and that the son was mentally ill, as reported by his mother to the officer earlier in the day.

72.     Additionally, Kanwarbir was not a large man – he was visibly skinny and weighed all of around 155 pounds.

73.     Still, with their firearms out, no one in danger or in imminent harm, the son being mentally ill, the child and car safely returned home to the mother, and only a misdemeanor involved, Defendant Wojcik and Officer Messing repeatedly shouted for Kanwarbir to place his hands out of the window and started threatening him that they will let the dog out on him.

74.     Several times, Kanwarbir asked officers, "*what did I do?*", after he had returned home with his mother's car.

75.     STPD officers, including Defendant Wojcik's, never answered Kanwarbir's question.

76.     Instead, a witness reported that she "heard the police telling [Kanwarbir] to put [his] hands out of the window or they will, 'let the dog go.'"

77.     In addition to pointing their firearms at Kanwarbir, Defendant Wojcik also brought out his police dog and threatened to release it on Kanwarbir.

78.     Indeed, dashcam footage shows that Defendant Wojcik was in possession of a large German Shepard that was outside the police car and just a few feet away from Kanwarbir barking relentlessly at him.

79.     Another witness reported that she heard an officer shout, "Get your hands out of the window or we will have to let the dog on you."

80.     Recordings obtained indicate that Defendant Wojcik then told other STPD officers that Kanwarbir allegedly had a gun.

81.     At one point, Kanwarbir's sister, Krisham, came out of their apartment and asked STPD officers to allow her to speak to Kanwarbir.

82.     Krisham also told officers that Kanwarbir did not have a gun.

83.     Officers ordered the sister, Krisham, back inside her house where Kanwarbir and their mother lived.

84.     Dashcam footage shows that with no bystanders in sight, no one in imminent danger, with the son safely returned home, and with the car returned to its parking spot, there was no indication to establish what the sense of urgency was for Defendant Wojcik (and later Defendant Zuk) to rush in and threaten a mentally ill person with their guns drawn to get him out of the car with the dog barking – for a misdemeanor offense – all within earshot of his mother's house.

85.     However, apparently at one time recognizing that Kanwarbir was not posing an immediate threat to anyone, and with the situation relatively stable,

Defendant Wojcik advised that he would wait to take further action until his sergeant arrives.

86.     At around 1:05 a.m., STPD Officer Robert Veprauskas arrived on the scene, exited his vehicle, and also pointed his firearm at Kanwarbir who was still in the vehicle he parked.

87.     After assessing the situation further, Officer Veprauskas then asked Officer Messing if he had the less than lethal shotgun.

88.     Officer Messing responded that Sergeant Barr should have it.

89.     At around 1:07 a.m., STPD officers reported that they could not hear what Kanwarbir was saying.

90.     At around 1:08 a.m., Officer Jeffrey Walsh arrived at the scene.

91.     Also, at around 1:08 a.m., Defendant Jason Zuk arrived at the scene.

92.     Dashcam footage shows Defendant Zuk listening to music describing an abusive relationship, titled "Blown Away", as he drove to the scene.

93.     As soon as Defendant Zuk exited his vehicle, he was armed with his shotgun and asked Defendant Wojcik, "*which vehicle*", who then pointed out the Honda.

94.     Defendant Wojcik then informed Defendant Zuk that Kanwarbir said he would "come out" if the dog was put away.

95.     Defendant Zuk stationed himself standing behind the bed of a truck that was parked one open parking spot away and to the left of the Honda – providing him full cover – and pointed his shotgun directly at Kanwarbir.

96.     During this time, Kanwarbir had remained in the vehicle for over 8 minutes – as he was instructed before committing to "get out" of the vehicle after the dog was put away – with the area being secured, and no one in immediate danger.

97.     Seconds after telling Defendant Zuk that Kanwarbir would "get out" of the vehicle when the dog was put away, and with no one in danger or imminent harm, Defendant Wojcik turned back to Kanwarbir and began shouting, "dogs away, put your hands out the window."

98.     Without even waiting for an officer to obtain less than lethal force as was originally planned, or getting it himself, Defendant Wojcik did a reversal and ordered the son to get out of the car while guns were drawn on him.

99.     Again, dashcam footage show that at that moment – while there was no one in imminent danger, the perimeter secured, a large police presence with guns drawn, the son safely home, and the car parked back in its place – there was no reason for Defendants to begin threatening a known mentally ill person with force, including being attacked by a dog, if he does not come out of his mother's car that was already parked at his, and his mother's, residence.

100.  Meanwhile, there is no evidence that the vehicle was stolen as Defendant Wojcik described, or that the mother ever said that the vehicle was stolen, and officers are well aware that a child taking a car without their parents' permission is actually a domestic dispute and that the child's conduct amounts to a mere violation of the joy riding statute.

101.  Indeed, insurance records show that Kanwarbir was an authorized driver for the vehicle in question.

102.  All along, while Kanwarbir was being ordered to get out of the car, Defendant Zuk aimed his rifle at the head of Kanwarbir, and was within eyesight of Kanwarbir.

103.  Still, insisting on forcing him out of the car under the threat of force, as Kanwarbir was exiting the vehicle, as ordered, and as soon as both of Kanwarbir's feet were on the ground, Defendant Zuk shot the son within earshot of his mother's apartment who heard the shot.

104.  Defendant Zuk shot Kanwarbir in the upper chest and neck area, causing Kanwarbir to immediately fall onto the ground panting, wheezing, and scrambling in pain before dying.

105.  In totality, nearly 10 minutes had lapsed between the arrival of the first officer – Defendant Wojcik – and additional officers, and only 20 seconds had elapsed between the time Defendant Zuk barged into the scene and shot Kanwarbir

to death with his shotgun while he was stationed fully protected behind the cover of a truck.

106.   As part of standard police practice, the first officer who arrives at the scene should take command and shout orders or communicate with the suspect in order to maintain clear communications, unless that officer cedes command to another officer or a higher-ranking officer assumes command.

107.   Multiple officers yelling multiple different commands could lead to confusion, including where, as here, one officer's order to "walk towards" them upon exiting the vehicle led to Kanwarbir getting shot for following that order.

108.   Indeed, Defendant Zuk was only a patrol officer, was not first at the scene to assert command, and was never given command before he shot Kanwarbir to death roughly 20 seconds after his arrival.

109.   In fact, during the seconds after Defendant Zuk's arrival, and seeing that the officers on the scene, including Defendant Zuk, Defendant Wojcik, Officer Messing, and Officer Veprauskas, had formed a semi-circle surrounding Kanwarbir's vehicle, Officer Walsh went to the rear of a police vehicle to retrieve the less than lethal shotgun and a shield.

110.   Defendant Wojcik, who had been engaged with Kanwarbir for nearly 10 minutes, was well aware of his mental condition, and was closest to Kanwarbir, did not shoot at Kanwarbir.

17

111.   Defendant Zuk was the only person to shoot Kanwarbir.

112.   Audio records also demonstrate that never once did Defendant Wojcik inform his colleagues that they were dealing with a mentally ill or challenged person.

113.   Also, seconds before the shooting, again dashcam video shows that Defendants Zuk and Wojcik were not under any danger or imminent harm whatsoever, when Kanwarbir remained in his vehicle as ordered, and while they waited for the Sergeant to arrive to use non-lethal force, if needed.

114.   Dashcam video and police reports further show that with at least six police cars present, the officers keeping the perimeter secured, and no one was in imminent harm while Kanwarbir remained in the vehicle, there was no reason for Defendants Wojcik and Zuk to rush and escalate the situation – instead of de-escalating the situation – by threatening the mentally ill person with lethal force, and use of a dog, if he does not get out of the vehicle, until they were equipped with non-lethal force to use, if needed.

115.   In other words, with the perimeter secured, no one in imminent danger, the car returned safely home to the mother, and recognizing that the occupant is mentally challenged, there was no sense of urgency or danger for Defendants Wojcik and Zuk to escalate the situation by threatening lethal force and use of a dog if Kanwarbir does not come out of his vehicle.

116.   It is not clear why STPD Officers did not just wait it out or until the occupant – who had returned the care safely and where the mother was just mainly concerned about his well-being – came out or until the arrival of non-lethal force at their disposal to safely resolve the incident.  Instead, both Defendants, Wojcik and Zuk, decided to escalate the situation, which resulted in the death of a son.

117.   It was not objectively reasonable for any of Defendant STPD's Officers, especially Defendant Wojcik who made the stop, to point lethal weapons at Kanwarbir during the entire time, and continue to escalate the matter, resulting the boy's death.

118.   It was also not objectively reasonable for any of Defendant STPD's Officers, especially Defendants Wojcik and Zuk, to escalate the situation further – as opposed to de-escalate – and/or use lethal force.

119.   Krisham witnessed her brother being shot by Officer Zuk, ran out of the house, and cried out, "Oh my god" and "My brother, my brother!"

120.   Officers then ordered Krisham back inside her house, which she did again.

121.   Officers later came to Kanwarbir's apartment to further investigate him by speaking to his mother, father, and sister, all of whom were present at the apartment and either heard or saw STPD Officers engage with, and use excessive force, on Kanwarbir.

122.   Kanwarbir's family reminded STPD Officers of Kanwarbir's mental health.

123.   Kanwarbir's death was later ruled a homicide.

124.   This devastated the family and Kanwarbir's mother and sister could no longer speak to STPD Officers and left their apartment in a flood of emotions.

125.   Kanwarbir's father was left with the excruciatingly difficult task of speaking to the police force which killed his son.

126.   Kanwarbir's father was distraught and told STPD that they should be investigating criminals, not his son who had returned home and brought home the vehicle at issue in the earlier November 2, 2018 police call by Kanwarbir's mother.

127.   As a direct and proximate result of the Defendants' actions, Kanwarbir suffered physical and emotional injury, pre-death terror, conscious pain and suffering, was deprived of his life, and lost the enjoyment of his young life.

128.   Defendants' actions were reckless, willful, wanton, and malicious, thus entitling Plaintiff to an award of punitive damages.

129.   Defendant Wojcik claimed Kanwarbir said he had a gun, however, no gun was found on the scene or in Kanwarbir's person when searched after Defendant Zuk shot him.  Also, dashcam footage shows no evidence that Kanwarbir allegedly said he had a gun.

130.   When paramedics left the scene, one witness described them as "not in a hurry" because Kanwarbir was already dead.

131.   In the aftermath of Kanwarbir's killing by Defendants, Defendants' police reports and press releases claimed officers were "responding to the scene of a stolen vehicle/armed suspect", where, in fact, that vehicle was not stolen – which would constitute a felony – but instead was taken without his mother's permission – which is only a misdemeanor.

132.   In essence, there were at least six STPD Officers involved and five police vehicles for the commission of a misdemeanor regarding a vehicle that was returned safely at the family's home.

133.   At no point did Defendant Wojcik work to properly de-escalate the situation further and properly inform his colleagues that they are dealing with a domestic dispute involving a mentally ill son and his mother.

134.   Instead, Defendant Wojcik chose to continue escalating the situation by holding Kanwarbir at gun point for approximately eight minutes while threatening the use of a dog.

135.   Defendant Wojcik was well aware of Kanwarbir's mental challenges.

136.   Incredibly, in Defendants' police report, CR No. 180031051, Defendant Wojcik wrote, in part, the following description of events regarding the "[r]ecovered stolen auto": "*On scene writer held the subject at gun point and*

*directed him to shut his vehicle off and to put his hands outside the drivers side window. The subject complied and shut his vehicle off and then put his hands out the window. After a few moments the occupant who was later identified at [sic] Kanwarbir Singh Malhi started to be non-compliant with commands and pulled his hands back into the car. Shortly, there after the vehicle was recovered.*"

137. Defendant Wojcik was well aware that the vehicle was returned home safely by Kanwarbir himself – with no assistance from police – and was parked where it was supposed to be at the mother's home. The vehicle was not 'recovered' by the police – it was confiscated after being safely returned home. Wojcik was also well aware that the primary purpose of the mothers 911 call was for the "well-being" of her mentally ill child, as the recovery of the car was a secondary issue.

138. As a direct and proximate result of the Defendants' actions, Gurraj and Rachhpal were deprived forever of their son's love, support, services, care, companionship, advice, guidance, counsel, instruction, and society, and suffered mental anguish and extreme emotional distress, in addition to incurring funeral and other expenses.

139. As a direct and proximate result of the Defendants' actions, Krisham, and her older brother, Karanjit, were deprived forever of their brother's love, support, services, care, companionship, advice, guidance, counsel, instruction, and society, and suffered mental anguish and extreme emotional distress.

## COUNT I

## FOURTEENTH AMENDMENT VIOLATIONS

140. Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

141. Kanwarbir's Constitutionally protected rights that Defendants violated include the following:

　　a. His right to liberty protected in a substantiative component of the Due Process clause of the Fourteenth Amendment which includes personal safety, privacy, liberty, and freedom from captivity; and

　　b. His right to free and equal treatment guaranteed and protected by the Equal Protection clause of the Fourteenth Amendment.

142. By reason of the foregoing, using excessive force, assaulting Kanwarbir, seizing him, and killing him, Defendants Zuk and Wojcik deprived Kanwarbir of the rights, remedies, privileges, and immunities granted to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment of the United States Constitution to be free from gratuitous and excessive force. Defendants Zuk's and Wojcik's conduct manifested deliberate indifference to Kanwarbir's constitutional rights.

143. Defendants Zuk and Wojcik acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as STPD officers. Defendants Zuk and Wojcik's acts were beyond the

scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants Zuk and Wojcik acted willfully, knowingly, and with the specific intent to deprive Kanwarbir of his constitutional rights, secured by 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

144.    Defendants, Wojcik and Zuk, acting under color of state law, violated the above Constitutionally protected rights by wrongfully detaining Kanwarbir, depriving him of his freedom, including freedom of movement, and subjecting him to wrongful an unreasonable search and seizure, including the use of excessive force.

145.    In addition to initially being held at gun point while compliant with Defendant Wojcik's commands, Defendants deprived Kanwarbir of personal liberty, including the freedom of movement, and unreasonably continued the detention of Kanwarbir, with a continued threat of excessive force regarding a domestic matter.

146.    Defendants also violated the above-mentioned rights of Kanwarbir by extra-judicially killing him, including after he surrendered to Defendants.

147.    As a direct and proximate result of Defendants' conduct, Kanwarbir suffered economic and non-economic damages, including but not limited to physical injuries, loss of freedom, loss of reputation, mental and emotional distress, humiliation, embarrassment, anxiety, freight, discomfort, pain, and loss of life.

24

148.  Also, as a direct and proximate result of Defendants' conduct, Kanwarbir's survivors, including his parents and siblings, have sustained loss of society and companionship, among other losses.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court grant judgment against Defendants Zuk and Wojcik for compensatory damages for whatever amount the jury finds necessary, and further demand judgment against individual Defendants for punitive damages for whatever amount the jury finds necessary, plus costs of this action, attorney fees, and such other relief as this Court deems just, proper, and fit.

## COUNT II

### FOURTH AMENDMENT VIOLATION

149.  Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

150.  Kanwarbir's Constitutionally protected rights that Defendants violated include the following:

> a. His right to be secure in his person, papers, and effects against unreasonable searches and seizures under the Fourth Amendment.

151. By reason of the foregoing, using excessive force, assaulting Kanwarbir, seizing him, and killing him, Defendants Zuk and Wojcik deprived Kanwarbir of the rights, remedies, privileges, and immunities granted to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not

limited to, rights guaranteed by the Fourth Amendment of the United States Constitution to be free from gratuitous and excessive force. Defendants Zuk's and Wojcik's conduct manifested deliberate indifference to Kanwarbir's constitutional rights.

152. Defendants Zuk and Wojcik acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as STPD officers. Defendants Zuk and Wojcik's acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants Zuk and Wojcik acted willfully, knowingly, and with the specific intent to deprive Kanwarbir of his constitutional rights, secured by 42 U.S.C. § 1983, and the Fourth Amendment to the United States Constitution.

153. Defendants Zuk and Wojcik, acting under color of state law, violated the above Constitutionally protected rights, by wrongfully detaining him, depriving him of his freedom, including the freedom of movement, and subjecting him to wrongful and excessive use of force, including shooting him with a shotgun.

154. In addition to initially being held at gun point while compliant with Defendant Wojcik's commands, Defendants deprived Kanwarbir of personal liberty, including the freedom of movement, and unreasonably continued the detention of Kanwarbir.

155.   As a direct and proximate result of Defendants' conduct, Kanwarbir suffered economic and non-economic damages, including but not limited to physical injuries, loss of freedom, loss of reputation, mental and emotional distress, humiliation, embarrassment, anxiety, freight, discomfort, pain, and loss of life.

156.   Also, as a direct and proximate result of Defendants' conduct, Kanwarbir's survivors, including his parents and siblings, have sustained loss of society and companionship, among other losses.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court grant judgment against Defendants Zuk and Wojcik for compensatory damages for whatever amount the jury finds necessary, and further demand judgment against individual Defendants for punitive damages for whatever amount the jury finds necessary, plus costs of this action, attorney fees, and such other relief as this Court deems just, proper, and fit.

## COUNT III

## VIOLATION OF KANWARBIR'S CONSTITUTIONAL RIGHTS BY SHELBY TOWNSHIP

157.   Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

158.   At all times material to this Complaint, Defendant Shelby Township, through its police department, pursued de facto policies, practices, and customs that were a direct and proximate cause of the unconstitutional arrest and use of excessive

force and the other deprivations of Constitutional rights alleged herein, including the Fourth and Fourteenth Amendments of the Constitution.

159.   Defendant Shelby Township permitted, encouraged, tolerated, and ratified a practice of unjustified, unreasonable, and illegal arrests by police officers in that Defendant Shelby Township failed to properly train, supervise, monitor, discipline, transfer, counsel, or otherwise control police officers regarding procedures for arrest management of persons who are afflicted with mental illness, and where said failure amounted to deliberate indifference to the rights of a person with whom the police come into contract.

160.   Defendant Shelby Township, through STPD, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of excessive force by STPD officers at the time of Kanwarbir's killing.  This widespread tolerance of excessive force by police officers regardless of the known mental illness/challenges of the suspect, constituted a municipal policy, practice, or custom and led to Kanwarbir's shooting and death.

161.   By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of excessive force, regardless of the known mental illnesses/challenges under which Kanwarbir was killed, Defendant Shelby Township deprived Kanwarbir of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not

limited to, the right to be free from gratuitous and excessive force guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

162. Upon information and belief, Defendant Shelby Township's systemic deficiencies include, but are not limited to:

    a. Failing to properly train officers on how to interact, arrest, or apprehend suspects that are afflicted with known mental illnesses and/or challenges;

    b. Failing to train police officers properly on arrest management and applicable law pertaining to suspects that are afflicted with known mental challenges, where such failure amounted to deliberate indifference to the rights of persons with whom the police come into contact; and

    c. Other acts and omissions which will be determined during discovery.

163. The municipal policymakers of Defendant Shelby Township have failed to enforce or enact departmental policies in place to train officers in interacting with, arresting, or apprehending suspects with known mental illnesses or challenges.

164. As a direct and proximate result of Defendants' conduct, Kanwarbir suffered economic and non-economic damages, including but not limited to physical injuries, loss of freedom, loss of reputation, mental and emotional distress, humiliation, embarrassment, anxiety, fright, discomfort, pain, and loss of life.

165. Also, as a direct and proximate result of Defendants' conduct, Kanwarbir's survivors, including his parents and siblings, have sustained loss of society and companionship, among other losses.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court grant judgment against Defendants for compensatory damages for whatever amount the jury finds necessary, and further demand judgment against individual Defendants for punitive damages for whatever amount the jury finds necessary, plus costs of this action, attorney fees, and such other relief as this Court deems just, proper, and fit.

<u>COUNT IV</u>

**GROSS NEGLIGENCE BY INDIVIDUAL DEFENDANTS**

166.   Plaintiff repeats and re-alleges the foregoing paragraphs, as though fully set forth herein.

167.   Defendants Zuk and Wojcik's conduct, as described above, which proximately caused Kanwarbir's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for whether Kanwarbir would be injured.

168.   No magistrate or competent judicial authority had issued a warrant for Kanwarbir's arrest and/or detention.

169.   As a proximate cause of defendants grossly negligent actions, Kanwarbir has suffered the above-mentioned injuries as well as other injuries, including but not limited to pain and suffering, humiliation, embarrassment, and physical injuries, including loss of life.

170.  Also, as a direct and proximate result of Defendants' conduct, Kanwarbir's survivors, including his parents and siblings, have sustained loss of society and companionship, among other losses.

171.  Defendants Zuk and Wojcik are also liable for Kanwarbir's injuries and damages under MCL 691.1407(2).

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court grant judgment against the individual Defendants for compensatory damages for whatever amount the jury finds necessary, and further demand judgment against individual Defendants for punitive damages for whatever amount the jury finds necessary, plus costs of this action, attorney fees, and such other relief as this Court deems just, proper, and fit.

Respectfully submitted,

**AKEEL & VALENTINE, PLC**

By: /s/: Shereef H. Akeel
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Adam S. Akeel (P81328)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 420
Troy, MI  48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
adam@akeelvalentine.com

DATED: June 17, 2021

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARANJIT MALHI, as Personal Representative,
for the ESTATE OF KANWARBIR SINGH
MALHI, deceased,

     Plaintiff,                       Case No.

v                                   Hon.

THE CHARTER OF SHELBY TOWNSHIP,
Police Officer JASON ZUK in his individual
capacity, and Police Officer JOSEPH
WOJCIK in his individual capacity,

     Defendants.
_____

SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
Akeel & Valentine, PLC
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 420
Troy, MI   48084-4736
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com

**JURY DEMAND**

**NOW COMES** Plaintiff, KARANJIT MALHI, as Personal Representative,

for the ESTATE OF KANWARBIR SINGH MALHI, deceased, by and through his

undersigned counsel, Akeel & Valentine, PLC, and hereby demands a Trial by Jury of the above-referenced causes of action.

Respectfully submitted,

**AKEEL & VALENTINE, PLC**

By: /s/: SHEREEF H. AKEEL_____
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Adam S. Akeel (P81328)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 420
Troy, MI  48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
adam@akeelvalentine.com

DATED: June 17, 2021

O:\Malhi\Complaint and Jury Demand.docx